We have one case to be submitted this afternoon on oral argument, Lillie v. Office of Financial Institution, State of Louisiana, and we'll hear from Mr. Preece. If I mispronounced that, please correct me. Preece is highest pronounced. Preece, all right. First time it's been pronounced. Okay, Mr. Preece. Judge Ho has heard me say that before, you know, and Judge Grace has too, but may it please the court. Can I take a minute? You certainly may, yes. Thank you very much. May it please the court, the Otter Statement of Law resolves in our favor the argument that SEI must be actively involved in the fraud. As we note in our brief, the culpable participation requirement on which the district court relied is not the law in the Fifth Circuit, and I think in much of the briefing that SEI made, they argued they had to be in active participant, but I think that Otter puts that to bed. So, the real question that we have here today for these Stanford victims is the power to stop the violation, the power to stop the violation, and I think Otter says that the power to stop standing alone is not enough, that's what it says. So what we've got to deal with here today, factually, is what falls outside of the standing alone exception. Now, I can make your job easy. If the contract is the only thing that you look at based upon our pleadings, then I lose because that's what Otter deals with, is the contract. So, and I say that Otter is the proper statement of law in the Fifth Circuit, so the question becomes is how do our facts differ from Otter, and it's really pretty simple. Judge Godbee, in a ruling in July of 2015, ruled that the contract coupled with SEI serving as a de facto trustee was sufficient to establish a cause of action, so we were entitled to that, and that's both in the opinion and that's in paragraph 29 of our complaint. So the question becomes is what did SEI do that would be something greater than the obligations in the contract? Now, that question also deals directly, Judge Smith, with the questions that have been raised in the discovery cases, because obviously, if we're not able to present the best set of facts based on the SITCO serving as a de facto trustee, then international shortstop in Brazos River, even though it's our position that they didn't comply with either one of them, really is not relevant because we're not going to establish a cause of action anyway as Judge Jackson connoted. But it's my position that if you look at the activities of SEI and the time frame in which it was involved, then it's much more than a contractual relation. Now, I'm going to talk about what I refer to as the IRA Ponzi scheme. In 1998, when Stanford was still running gymnasiums, he had no experience in trust companies. He decided he wanted people that were retiring to roll their money into IRAs. So if people worked for Exxon and they were in their pension plans, when they left, they rolled it into an IRA. But to do that, you had to have a custodian of the IRA. Now, the sole purpose of this investment entity was to invest in these SIBCDs, the Stanford International Bank CDs. The one that we're talking about here today, all the liquid securities were handled by Pershing, Bank of New York, or Bear Stearns. But the sole purpose of this entity was to hold the SIBCDs. So what did they have to do to set up an investment vehicle in 1998 to do that? They had to find a custodian. It shouldn't surprise you they couldn't find a custodian. So who did they get? They decided to go buy a defunct trust company out of Ruston, Louisiana. This defunct trust company would serve as a custodian for every person in the United States that wanted to buy an SIBCD in their IRA account. And it happened over and over again that they went out and they purchased these SIBCDs in this trust. Now, why is it important? Because SEI was the one that gave this former runner of gyms and workout facilities the expertise to set up a trust company. And that was in 1998. Now what's the importance of 1998? In Jan V. B. Brown, decided by this court, of which I was one of the people that argued it related to principal clawbacks, but it states in there that based upon the testimony of Ms. Van Tassel, and I quote, Van Tassel concluded that the scheme began and was a solvent as early as 1999. So at the exact same time that the IRA Ponzi scheme was being put into place, where Stanford would serve as the custodian, but in truth and fact, SEI was performing all of the work. And they went out and over a period of time solicited millions and millions and millions of dollars of unsophisticated retirees' funds. Now, the question that's got to be decided by this court is based on Otter's. It says that SEI played the role of being a lessor, an electrician. In other words, that's the analogy that was used in Otter's decision, that an electrician could stop it, or a lessor could stop the Ponzi scheme, but it takes something more than that. And what I submit to the court is that the role of SEI was much bigger than that. They were the- In this case. That's right. That's right. So you agree you need to demonstrate the difference between Otter's and this particular- In this case, it's- I'm just trying to get an answer. Do you agree that that's what you need to do in order to- It's different. Otter's, in this case, is different for this reason. All right. That's what I'm listening for. Okay. Here's the difference. That's right. I knew you were going to ask that question. All right. Otter's is different because of paragraph 29 in the complaint that we filed, the amended complaint that we filed, that said that they were de facto trustee. And when Judge Godbee ruled on that, and the contract was presented at the same time, he said the contract is not solely determinative of the controlled person liability issue. And that was opinion that was rendered in 2015. Judge Jackson, in this case, never considered de facto trustee, never considered it. And the de facto trustee argument is the one that I just said, that it's not like Stanford went out and bid this. That's not the case. SEI came to them, and they devised the way that the custodian could invest in these high-risk affiliate SIBCDs, and there was only one way. Nobody else would touch it. The only way that it could be done is if Stanford went out and became the custodian. He didn't know how to run a trust company, so SEI was the one that ran the trust company. That factual scenario was never discussed in Otters. Never discussed in Otters. Now, Otters are the opt-outs of our class action, and as the court is aware, we certified this originally in state court in Baton Rouge. It got moved into federal court, and then seven years later, Judge Godbee certified it again. This is the only class action. So are you conceding that there's evidence of control, that you wanted to present the law, but didn't get presented? You're saying the court never considered it. We presented it at the summary judgment level before Judge Jackson, okay, on the de facto control, the exact thing that I just went through, okay? The district court dismissed our case on a summary judgment without ever considering the second argument that we had. One of them was based on the contract, and the other one was based upon de facto control. In other words, they were exercising control from, as we call it, cradle to grave in 1998 when the scheme was devised. Now, Otters doesn't deal with that issue either because of the fact that it was based solely on the contract, and Judge Graves, as I said when I started, if the contract is the only evidence of control, and we all know that control is a factual issue, if the contract is the only evidence of control, I lose. But that's not the case because sophistication of the parties is an important determination. Why do I say that? Because Allen Stanford had no sophistication in the trust business. SEI had a lot of trust, and based on G.A. Thomas, the degree of influence exercised by a participant gives rise to control person liability. So the question in this case is what degree of influence did SEI exercise when essentially Allen Stanford didn't know anything about running a trust company in the inception? Now, another case that deals with additional evidence . . . I'm sorry. What is the evidence that you have here that wasn't in Otters? Excuse me, Judge. What is the evidence of control that you have here that wasn't in Otters? The evidence . . . Specifically. Well, the whole issue concerning in 1998 that SEI was the party that came up with the way for Stanford to go out and buy a trust company, be the custodian, and then be able to run the Stanford Ponzi scheme because no other person would serve as custodian. In other words, no entity would serve as custodian and allow it to invest solely in the SIB . . . Well, how does that show control? Because they were set in the policy of the company, and the definition of control is caused the direction, indirectly, of management and policies by contract or otherwise. They were clearly establishing the policies of the trust company in the inception based upon their sophistication and their lack of . . . Stanford's lack of sophistication. At a minimum, it presents a question of fact, and it also is at the same time that the Ponzi scheme was initiated based upon Brown. Now, the Heck case, which I know you all are familiar with, that's an important case because if you recall in Heck, that case went to trial, but the CPA there ended up being upheld as having control person liability because he contributed more than just being a CPA. That's the Heck case, and the Fifth Circuit affirmed that. So the question that I have is this. The Otters basically says that it's the ability to control the specific transaction. It agrees that the ability to stop a violation in the right circumstance would give rise to control person liability, and it says the ability to control the specific transaction. Otters' terms on the transaction is being the valuation, no question about that, and the laws . . . and what the court says is that the valuation . . . There's a big disconnect, though, between SEI having the ability to distribute this false information over a period of 15 years when it knew that no independent valuation existed, even though it did not actually create the valuation. Thank you, Mr. Price. You've saved time for rebuttal. Mr. Cooney? May it please the Court, my name is Gordon Cooney, and I represent the SEI defendants. Under this Court's decisions in Otters, in Heck, and most recently in Sitko, the District Court properly articulated and applied the correct standard for control person liability under the Louisiana Securities Law, and under that standard, the District Court correctly concluded that there was no evidence that SEI controlled the acts of primary liability by Stanford Trust in this case. The Court's opinion in Otters is particularly instructive because it's a companion case to this one, and it concerned the same allegations, the same record evidence, and the same legal theories. Although the Otters plaintiffs did not raise a Rule 56D issue, the District Court, for multiple independent reasons, substantiated by this Court's tests under Rule 56, properly declined the plaintiff's request to defer resolution of the summary judgment motion. I want to focus on three aspects of Otters that I think are particularly noteworthy. First, Otters was briefed and argued in the District Court after the District Court had decided this case. So the record was closed in this case, the case had been decided, and the record that the Otters plaintiffs offered was the same record here, plus additional evidence. There is no evidence in the record in this case that wasn't in the record in the Otters case. The District Court rejected, or the Circuit Court, this Court rejected the argument in Otters, which is the central argument here, that the power to stop is the same as the power to control. And this Court correctly concluded that the power to stop by denying services or discontinuing services does not equal control. The Otters Court noted the expansive interpretation of controlled person liability that a contrary conclusion would produce. But putting aside electricians and plumbers, if you look at other cases that are relevant, the role of the alleged controlled person in the Solo case was more significant than the role of SEI in this case. The role of the defendant in the Sitko case was more significant than the role of SEI in this case. In fact, counsel for plaintiffs in the Sitko case sought to distinguish in Sitko the greater role of the Sitko defendant than the role of SEI in this case. Second, I think, key point from Otters was that the Court focused on the fact that the contract, but starting with the contract, the record showed the absence of control by SEI over the primary violations. And so looking at the contract, the contract assigned no role to SEI in the offer or sale of securities. The contract assigned to Stanford Trust the responsibility for valuing the CDs, and Stanford Trust was responsible for giving accurate information to SEI so that the SEI computer system could generate the account statements of Stanford that went to the customers as Stanford statements. Mr. Price acknowledges that under the contract he loses, but that we need to look at the broader picture. Yes, Your Honor. But whether you agree with that or not, tell us what the broader picture will tell us based on what you said. Yes, Your Honor. And I think if you look at Otters, the Otters Court did not restrict its analysis to the contract. It said the contract provided strong evidence, and then it looked at the record and said there was no evidence in the record that showed that the parties behaved in a manner different than the contract established. There was no record evidence offered by the plaintiffs that showed that SEI was involved in the offer or sale of securities. There was no record evidence that showed that SEI was involved in the valuation of the CDs, and to the contrary, the record evidence showed that SEI was not involved. So the Otters opinion and the record here, because it's the same, demonstrates that it was not limited to the contract, that the record evidence there as here, we didn't hear that showed that SEI exercised control over the acts of primary liability by Stanford Trust, which were the offer and sale of securities or the valuation of the CDs. And there is no evidence in the record here, whether you're starting with the contract or looking at the other evidence that was offered by the parties. And then the third thing that's significant, and Mr. Price spoke to this, is the Otters Court rejected the argument, also made here, that control person liability can be established because plaintiffs contend that SEI controlled the day-to-day affairs of Stanford Trust as a result of its contract to provide certain back office functions. That was an argument that was made in the Otters case. It was made here. Contrary to what Mr. Price said, Judge Jackson addressed that issue both in his original opinion and significantly in his order denying reconsideration. But what the Otters Court said was this issue of control over the day-to-day activities of a primarily liable defendant. Some courts have found that to be an additional requirement of control person liability. But what this court said, it is not a substitute for or provide facial evidence of control by the defendant over the primary liability activities of the violator. This case is not about running the back office trust functions at Stanford Trust. The case is about the fraudulent sale and offer of CDs, and it's about the fraudulent valuation of those CDs. Those are the acts of primary liability. And there is no evidence in this record, whether it's the contract or the other evidence offered by the parties, that establishes control in that regard. And so I guess the last two points I would make with regard to the substance and otters are, first, that the district court did not adopt a culpable participation standard. The district court actually said culpable participation is not required. The district court did rely on the Freedman case from the Second Circuit, but Freedman turned on two things, one, the lack of control, and two, the lack of culpable participation. And all that Judge Jackson did in this case was rely on the Second Circuit's discussion of control. And in that regard, the Second Circuit test is fully consistent with what this court has held in otters, heck, CITCO, et cetera, with respect to control person liability. Finally, although Mr. Price speaks to the district court's opinion on the motion to dismiss, obviously, a ruling on a motion to dismiss has no moment when we get to summary judgment where the question is not what the plaintiff may have alleged in the complaint, but what they can actually prove by way of summary judgment. And in any event, I think if the court were to look at the complaint or the petition that was filed in this case, one would find that that petition had no well-pleaded facts that substantiated any control under the Supreme Court standards in Iqbal and Twombly. I think what Judge Godby did was to give the plaintiffs an opportunity to develop a record in this case. The case was in federal court for six years before the district court granted summary judgment in this case. And based on this court's decisions in all the control person liability cases, looking at the Otters case, looking at the record here, which, if anything, is less than the record in Otters, the district court was fully proper in granting summary judgment, and the district judge's decision should be affirmed, Your Honor. All right. Thank you, Mr. Cooney. Mr. Price, you saved time for rebuttal. Your Honor, that brings us to the lack of discovery in this case. There's been no discovery. That's the primary complaint that we have. Now, I concede, as I conceded a while ago, I don't need any additional discovery if the contract is controlling. But there was no discovery in this case. The delays that have been implemented in this case were not in my making. The case was certified in state court. It moved into federal court, and I don't need to explain to this court the complexity of the matter. But . . . What did you do to seek discovery in this case? Excuse me? What did you do to seek discovery in this case? We filed for a number of conferences before Judge Godbee, and we could never get it. I mean, the way that the case operates over there, and I've probably appeared in this court more than anybody except Kevin Sadler on the Stanford issues, sixty or seventy lawyers would be in the courtroom, and they had multiple issues being considered, and cases like this didn't move along. Now, it's been suggested that this one was put . . . So you couldn't serve discovery on an opponent without the court's permission? No, that's not the case. The status of the case where you had the question of class certification open, the question of class certification was open all the way until November of 2018 as to whether or not this court would allow us to move forward with it, or whether it fell into the zicarious type situation, and since we only represented eleven hundred people versus the entire twenty thousand people like that you normally see in the Stanford case, this was just there, okay? Judge Godbee finally certified the class and gave us the ability to move forward. Now, what this case does, and I think that Judge Smith is well aware of this . . . So it was removed and then five years later is when he certified it, is what you're saying? That's correct. So you couldn't file any . . . or you didn't want to until you knew what he was going to do with that? He didn't know. So, I mean, I don't have the unlimited resources that the other side had, and it was just a matter of how you move the case forward, and there wasn't a whole lot of these cases that are the multiple cases in that jurisdiction moving forward. So in other words, we never did get discovery, and so we started moving forward with discovery in May of 18. Now, in this particular case, there's what we call the 2009 . . . Just to be clear, did Judge Godbee counsel you on how to move forward with discovery? Yes, sir. In 2018 . . . Did he recommend a motion to compel? In 2018, what he did is he said, when we objected to the responses to the interrogatories, he suggested that we go take a 30B6 deposition of SEI. We gave them six weeks to prepare. We went and took the 30B6 deposition. It was totally unresponsive, totally unresponsive. It runs afoul of every rule of CANDOR. The lady that signed the responses to the interrogatories, who was the president of the trust company, the gentleman that was tendered as a witness, didn't even consult her. Can you believe that? Did you all move to compel at that point? Excuse me, sir? Did you all move to compel at that point? Well, that's when the summary judgment was filed the next day after the deposition, which was totally unresponsive. So, no, you did not move to compel? Well, they had the burden, once that you have a nonresponsive 30B6 witness, it's their duty to . . . they should have sought a protective order under Rule 37 prior to that deposition. And I was the one, or our side was the one, that ended up getting the blame for their total lack of response when it was them that, under Rule 37, it becomes a non-appearance. And if you read in detail in this record, you'll see it's almost an embarrassment after Judge Godbee instructed the group for a 30B6 witness, and the witness shows up unprepared and didn't answer any questions and didn't consult with the person that had previously answered the interrogatories. All right. Thank you, Mr. Price. Thank you all. Your case is under submission. We appreciate counsel's patience and cooperation in getting this scheduled, and the Court is in recess.